McKINNE *vs.* THE STATE OF GEORGIA.

1. The act of October 12th, 1879, as embodied in the code, §4612(a), makes it a misdemeanor to engage in any act of cruelty to any domestic animal; and to "cruelly drive and cruelly treat" one or more horses is an offence under the act.

2. The value of the horses before the alleged cruel treatment, together with the extent to which their value was impaired by the same, may be received in evidence to throw light upon the nature of the treatment and upon the question of whether it did or did not cause unjustifiable physical pain or suffering, and amount to cruelty as defined by the statute.

3. The State may contradict matter in the prisoner's statement by a witness already examined, though to do so involves a repetition by the witness of some of his former testimony.

4. The verdict is consistent with law and supported by the evidence.

5. The sixth section of the act of 1879, read in connection with the title of the act, imports a total repeal of the acts both of 1875 and 1876, touching cruelty to animals. The act of September 21st, 1881, however, reinstates section 4310 of the code, as the measure of punishment.

July 11, 1888.

Criminal law. Evidence. Verdict. Practice in superior court. Practice in Supreme Court. Before Judge HARDEN. City court of Savannah. November term, 1887.

Frank McKinne was indicted for engaging in an act of cruelty to a domestic animal, in that he did "cruelly drive and cruelly treat" two bay mares of the value of $300.00 each. On his trial, the following evidence was introduced :

Alfred L. Hartridge testified that he was the owner of the horses charged to have been cruelly treated, and had had defendant employed for about two years up to the time of the commission of the alleged offence, July 5th, 1887. (The trial was January 3d, 1888.) Defendant was entrusted with full care of the horses. Witness had ordered him to come to town from witness's country home, about twelve miles from the city, and to get another man to help him to bring the mares from Luke Carson's stables in the city, out to witness's place. When witness reached home in the evening, he found the mares there. Both had been much heated, and one was

lame in the shoulder and had one foot sprained; both had galled backs, and the skin was off; the back of one was very badly galled, the other not so badly; they were galled where the saddles rubbed.   Drunken men lean forward or roll in the saddle when they ride, and this may account for the galled places.   Witness could ride one in three weeks, but the other is hardly well yet.   One was damaged $100 and the other $25.   Witness valued them at $300 each.   They were blooded animals, gentle but spirited, etc.

. Luke Carson testified that defendant came, with another boy, to his stables and got the horses; when witness gave them to him, he said, "ain't you going to have them shod?", to which witness replied that he had no authority from Major Hartridge; defendant said he would go and have it done; he had authority from Major Hartridge.   Both animals were in good condition when they left the stable; they were gentle and spirited, but could be easily ridden.   Witness does not know which horse either boy rode, and did not see them after they left the stables.

The defendant moved for a verdict on the ground that the State had not made out its case under the law. The motion was overruled.   The defendant made the following statement:

"Major Hartridge told me to get a boy and bring out the horses. The boy and I went to the stables and got them.   I asked Mr. Carson to have them shod, but he said he could not do it.   I did not have much to say at Mr. Carson's; the other boy did most of the talking. (Defendant then detailed how he went and had the horses shod.)   Started out to the country place at two o'clock and rode slowly.   A squall came up, and there was much rain and wind.   My hat blew off, and I got down to pick it up; and while I was down, saw the other boy on his hands and knees on the ground.   He had been thrown, and his horse came running past, and mine went along with it.   The horses went up to the house together, and we had to walk.   Neither of us rode the horses hard, and were careful to obey Maj. Hartridge's orders.   I was not under the influence of liquor, and did not maltreat the horses.

Neither was lame up to the time they ran away, about half a mile from home. I did not know of the gall on the back. The day was very warm, and I was particular not to ride fast and heat them. If their backs were hurt, it was because the saddles were not placed properly; and if they were sprained or strained, it was after they got away."

Luke Carson, in rebuttal, swore, repeating the conversation he had with defendant, and stating that he had nothing to say to the other boy at the time.

The defendant was found guilty. He moved for a new trial on the following grounds;

(1)—(4), (10) Because the verdict was contrary to law, evidence and the charge of the court.

(5), (7) Because of error in allowing Hartridge to testify as to the amount of pecuniary damage to the horses, and as to their value.

(6) Because of error in allowing Carson to testify in rebuttal of defendant's statement,—the objection being that witness had already stated all that occurred between him and defendant, and his evidence would be but a repetition.

(9) Because of error in refusing to rule out Carson's testimony in rebuttal, it being objected that it was not in rebuttal.

(11) Because of error in refusing to sustain defendant's motion for a verdict after the State had closed and before defendant made his statement.

The motion was overruled, and the defendant excepted. The sentence passed was to pay a fine of fifty dollars, or in default thereof, imprisonment with labor for four months. No exception was taken to the sentence. In connection with the last division of the opinion, it is proper to state that when the judgment in this case was rendered, the fifth of the head-notes then handed down and containing the synopsis of the points decided, included a direction to the presiding judge of

the city court to reconsider the sentence passed, and if, on such reconsideration, he should be of the opinion that §4310 of the code was not applicable, to modify the sentence to conform to the act of 1879.

J. R. Saussy, for plaintiff in error.

F. G. duBignon, solicitor-general, by R. G. Erwin, for the State.

Bleckley, Chief Justice.

1. The statute on which the indictment is founded is the act of October 12th, 1879, code §4612(a), which reads as follows: " Every person who shall set on foot, or instigate, or promote, or engage in, or do anything in furtherance of any act of cruelty to any domestic animal, shall be guilty of a misdemeanor," etc. We find on examination that this enactment was suggested by a statute of New York; but there it was but part of a system, whilst here it is the whole system adopted for the prevention of cruelty to animals, so far as range of indictable conduct is concerned. The learned counsel who argued the case for the plaintiff in error made a grammatical point, and elaborated it with an ingenuity that, though not convincing, was highly entertaining. His point was that no single, direct and immediate act of cruelty is made penal, but only anything done in furtherance of such an act. He who commits the main act, the last in the series, the one that excites the pain and suffering in the animal, is not within the purview of the statute; but those only who set on foot, or instigate, or promote, or engage in, or do something in furtherance of the main or ultimate act. In other words, to pass at once to the legal result of this construction, the chief offender, the principal in the busi-

ness, is not dealt with by the law, but his aiders and abettors, those who bear to him a relation analogous to that of principals in the second degree or accessories before the fact in felony are alone denounced as criminal. Such, in substance, was the contention of counsel, and the outcome of his nice and accurate grammatical argument.

Perhaps if he had been discussing the statute of New York, from which ours was taken, we could have agreed with him that, in connection with the other provisions of that statute, these particular provisions might be restricted to aiding and abetting; but we are satisfied they are not so restricted in our system, for they constitute the system and the whole of it. Besides, it is no strain upon language to hold that he who inflicts an act of cruelty promotes, engages in or does something in furtherance of such act, though it be his own. The very doing of the act, is engaging in or doing something that furthers it. All that is done whilst the act is in progress furthers it and promotes its accomplishment. To cruelly drive and cruelly treat any domestic animals, such as horses, is an offence under the words of the act of 1879, above recited, as well as to aid or abet another in so doing.

2. Evidence as to the value of the mares before the injury and of the extent to which their value was diminished by the injury was not irrelevant, as it would throw some light on the nature and severity of the treatment to which the animals were subjected. The statute declares that "the word cruelty shall be held to include every wilful act, omission or neglect, whereby unjustifiable pain, suffering or death is caused or permitted." If in going a distance of twelve miles, one of the mares lost value to the extent of $100.00, being one-third, and the other to the extent $25, being one-twelfth of her whole value

at starting, who would not conclude that the former was worse treated than the latter, and that both were more severely treated than if they had lost nothing or only a few dollars in value? The average loss of the one per mile was over $8, and of the other over $2. It is obvious, we think, that such deterioration in value might properly be considered in solving the question whether, under the circumstances, unjustifiable pain or suffering was caused by the act or acts which produced it.

3. There was no error in allowing the State to rebut the prisoner's statement by evidence, though the witness in rebuttal repeated some of his previous testimony. Had there been no reply to the statement, the jury may have thought that the witness had forgotten the exact facts, and this inference would be obviated, perhaps, by allowing the witness, after hearing the prisoner's version, to restate them. At all events, the matter was subject to the discretion of the court, and there was no abuse of the discretion that we can discern in the present case.

4. The verdict was justifiable with respect both to law and evidence. Though not the strongest, the case for the State was strong enough to warrant a conviction.

5. The act of September 21st, 1881, (acts of 1880–81, p. 142,) is not cited in the margin of the code of 1882, and therefore was overlooked when we suggested, in our judgment of affirmance in the present case, that the sentence pronounced by the city court be reconsidered. The learned and able judge of that court has since called our attention to the act above referred to, and there can be no doubt that under it his sentence was warranted by law, this act expressly adopting §4310 of the code, as the measure of punishment. Though the acts of 1875 and 1876 were both wholly repealed, this did

not hinder the present case from being governed as to penalty by §4310 of the code.

Judgment affirmed.